ICE COLD AUTO AIR OF CLEARWATER, INC., a Florida corporation d/b/a Ice Cold Auto Air; Ice Cold Auto Air, a Florida corporation d/b/a Ice Cold Auto Air; Oakridge Auto Air, Inc., a Florida corporation d/b/a Ice Cold Auto Air; Ice Cold Auto Air of Daytona, Inc., a Florida corporation d/b/a Ice Cold Auto Air; CASC, Inc., a Florida corporation d/b/a Ice Cold Auto Air d/b/a Muffler City; Colonial Auto Air, Inc., a Florida corporation d/b/a Ice Cold Auto Air; Florida Auto Air, Inc., a Florida corporation d/b/a Ice Cold Auto Air, Plaintiffs,

v.

COLD AIR & ACCESSORIES, INC., a Florida corporation d/b/a Cold Air & Accessories, Inc.; Lawrence A. Powalisz, an individual; Fioravanti Enterprises, Inc., a Florida corporation d/b/a Cold Air & Accessories, Inc.; C & L Auto Air, Inc., a Florida corporation d/b/a Cold Air & Accessories, Inc. d/b/a Muffler Man, Defendants.

No. 93–149–CIV–ORL–22.

United States District Court,
M.D. Florida,
Orlando Division.

June 7, 1993.*

---

* On July 6, 1993, Plaintiffs filed a Notice of Voluntary Dismissal.

Terry C. Young, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL, for plaintiffs.

Marc P. Ossinsky, Marc P. Ossinsky, P.A., Winter Park, FL, for defendants.

## ORDER

CONWAY, District Judge.

### I. INTRODUCTION

On October 10, 1983, Plaintiff Ice Cold Auto Air of Clearwater, Inc. and Plaintiff Ice Cold Auto Air, Inc. registered the following mark in the State of Florida:

ICE COLD AUTO AIR

The words "Ice Cold Auto Air" are flanked by a drawing of a penguin on the right and an igloo on the left.

The mark was registered as both a trademark and a servicemark, and the registration specified that the mark was "to be used in connection with the installation and after market repair of automotive air conditioning systems."

On February 26, 1991, Plaintiff Ice Cold Auto Air of Clearwater, Inc. registered with the United States Patent and Trademark Office two different servicemarks. Plaintiff's first registration, for "ICE COLD AIR," provides that "[n]o claim is made to the exclusive right to use 'air', apart from the mark as shown." This first registration reflects that

the servicemark "ICE COLD AIR" was first used January 31, 1990. Plaintiff's second registration for "ICE COLD AUTO AIR," provides that "[n]o claim is made to the exclusive right to use 'auto air', apart from the mark as shown." The second registration reflects that the servicemark "ICE COLD AUTO AIR" was first used March 31, 1979. Both registrations provide:

FOR: INSTALLATION AND REPAIR OF AUTOMOBILE AIR CONDITIONING SYSTEMS AND PERFORMING OTHER GENERAL AUTO AIR REPAIRS.

According to the Complaint, Plaintiff Ice Cold Auto Air of Clearwater, Inc. gave Plaintiff Ice Cold Auto Air, Inc. an exclusive license to use the second federally registered servicemark, "Ice Cold Auto Air." Plaintiff Ice Cold Auto Air, Inc., in turn, granted sublicenses to use the "Ice Cold Auto Air" mark to each of the other Plaintiffs in this action,[1] including Plaintiff Oakridge Auto Air, Inc., Plaintiff Ice Cold Auto Air of Daytona, Inc., Plaintiff CASC, Inc., Plaintiff Colonial Auto Air, Inc.[2] and Plaintiff Florida Auto Air, Inc. Each of Plaintiffs does business as Ice Cold Auto Air,[3] and Plaintiffs hereinafter collectively shall be referred to as "ICAA." According to the Complaint, ICAA owns and operates stores involving goods and services connected with the installation and repair of automotive air conditioning services. Although ICAA operates stores in Clearwater, Orlando, Daytona Beach and Fern Park, the issues in this case involve primarily stores located in the Orlando area.

Defendant Lawrence A. Powalisz was formerly the general manager and shareholder of two of the Plaintiffs in this case.[4] Accord-

---

**1.** Plaintiff Ice Cold Auto Air, Inc. also granted a sublicense to use the "Ice Cold Auto Air" mark to J.J. Auto Air, Inc., a corporation which is not a plaintiff in this action. However, the Complaint asserts that Plaintiff Ice Cold Auto Air, Inc. is obligated to defend the "Ice Cold Auto Air" mark on behalf of additional authorized licensees. J.J. Auto Air, Inc. does business as Ice Cold Auto Air at 900 North Orlando Avenue in Winter Park, Florida.

**2.** Affidavits filed by Plaintiffs in connection with the preliminary injunction hearing state that Colonial Auto Air, Inc. is being dissolved. The corporation that should have been listed in its

place is J.C. Auto Orlando, Inc. *See* Dkt. 55 and Dkt. 57. This proposed change in party does not affect the Court's analysis.

**3.** Additionally, Plaintiff CASC, Inc. does business as Muffler City.

**4.** This statement is based on paragraph 29 of the Complaint and Mr. Powalisz's affidavit. However, ICAA's Memorandum in Support of Temporary Injunctive Relief filed in the state court represents that Mr. Powalisz first worked for the Winter Park Auto Air location from April 1, 1987 through January 16, 1990. The memorandum does not suggest that Mr. Powalisz was a share-

ing to the Complaint, Mr. Powalisz and the two Plaintiff corporations ended their relationship in early February 1992, and then Mr. Powalisz formed Defendant Cold Air & Accessories, Inc. less than two months later. Also named as Defendants are Fioravanti Enterprises, Inc. and C & L Auto Air, Inc., both of which do business as Cold Air & Accessories.[5]

On February 2, 1993, ICAA filed a Complaint in state court setting forth the following claims:

Count I: federal trademark infringement under 15 U.S.C. § 1114(1)

Count II: use of false designation of origins, false descriptions and false representations (i.e., trade dress infringement) under 15 U.S.C. § 1125(a)

Count III: common law unfair competition

Count IV: common law palming off

Count V: state trademark dilution under Florida Statutes § 495.151

Count VI: violation of a non-compete agreement under Florida Statutes § 542.33

Count VII: violation of the Uniform Trade Secrets Act under Florida Statutes § 688.001.

ICAA also sought temporary injunctive relief. After a two-hour hearing on the temporary injunctive relief requested by ICAA on February 9, 1993, the state court scheduled a second hearing for March 9, 1993. On February 26, 1993, Defendant removed this case to federal court. The Court held a hearing on ICAA's motion for preliminary injunction on April 12, 1993.

holder at that time. After the Winter Park store was sold, Mr. Powalisz went to the Oakridge Auto Air location where he was both a general manager and a shareholder. Whatever the details of Mr. Powalisz's contact with ICAA may be, it is clear that his contact was substantial.

5. In addition, C & L does business as Muffler Man.

6. In addressing the infringement claim, the Court will rely on cases involving trademarks .

## II. PRELIMINARY INJUNCTION STANDARD

A movant for a temporary restraining order or preliminary injunction must show:

(1) a substantial likelihood that he will eventually prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985) (citation omitted).

## III. FEDERAL LAW: INFRINGEMENT OF A MARK

The key issue in determining whether a preliminary injunction should issue on the infringement claim[6] is whether a plaintiff is likely to prevail on the merits.

### a. Threshold Inquiry

■ The first issue the Court must address is whether the mark is distinctive enough to deserve protection under the Trademark Act of 1946 (commonly known as the Lanham Act), 15 U.S.C. § 1051 *et seq.,* specifically § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). *Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176 n. 1 (11th Cir. 1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). *See also, Discount Muffler Shop, Inc. v. Meineke Realty Corp.,* 535 F.Supp. 439, 444 (N.D.Ohio, 1982) (citing *Vision Center v. Opticks, Inc.,* 596 F.2d 111 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980)). There are four categories of distinctiveness in which a mark may be classified:

and servicemarks without noting the difference in the type of mark being considered, unless the distinction has a bearing on the Court's analysis. The analysis required in trademark and servicemark infringement is similar to the analysis of unfair competition pursuant to 15 U.S.C. § 1125(a) for trade dress or trade name infringement. Therefore, the Court will also refer to cases addressing trade name and trade dress infringement.

In ascending order they are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. The demarcation between each category is more blurred than it is definite. A term which suggests the basic nature of the service is generic. The term "Milk Delivery" is an example of a generic service mark for a hypothetical milk delivery service. A generic term is typically incapable of achieving service mark protection because it has no distinctiveness. A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be 'BarnMilk.' Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as 'Barney's' to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark. Marks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks. A suggestive term suggests the characteristics of the service and requires an effort of the imagination by the consumer in order to be understood as descriptive of the service. 'Barn–Barn' is an example of a suggestive term. Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. 'An arbitrary or fanciful [term] bears no relationship to the service.' Arbitrary and fanciful terms are also inherently distinctive, so they are protectable without proof of secondary meaning. 'Barnbarnfish' is an example of an arbitrary or fanciful service mark.

*Investacorp, Inc. v. Arabian Investment Banking Corp.*, 931 F.2d 1519, 1522–23 (11th Cir.1991) (footnotes omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991).

▆▆▆ As the Eleventh Circuit made clear in *Investacorp*, the categorization of a term as generic, suggestive or arbitrary typically resolves the issue of whether a mark is pro-

tectable. By contrast, the categorization of a mark as descriptive is just the first step in a two-stage inquiry. A term that is descriptive may still be protectable if it has acquired secondary meaning. Secondary meaning is the connection in the consumer's mind between the mark and the provider of the product or service. *Investacorp*, 931 F.2d at 1525. "A high degree of proof is necessary to establish secondary meaning for a descriptive term which suggests the basic nature of the product or service." *Am. Television and Communications Corp. v. Am. Communications and Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir.1987) (conducting the threshold inquiry in a case alleging unfair competition through infringement of a trade name). A plaintiff may meet its burden by consumer survey evidence. *Investacorp*, 931 F.2d at 1525. Absent survey evidence, the factors to consider in whether a mark has acquired secondary meaning are: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by a plaintiff to promote a conscious connection in the public's mind between the mark and the plaintiff's product or service. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984) (addressing trade name infringement).

[7–9] The threshold inquiry into the proper categorization of the mark permits the Court to withhold trademark protection for generic terms in order to avoid the creation of a monopoly in favor of the first provider of goods or services. *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir.1975). If the Court were to extend protection to a generic term, a competitor could not describe his goods or services as what they are. *Id.* Additionally, no word or phrase that is descriptive of a particular business or the services performed in connection with a business may be exclusively appropriated by one firm, unless the descriptive phrase has acquired secondary meaning. *See Car Care, Inc. v. D.H. Holmes Co.*, 160 So.2d 272 (La.Ct.App.1964) (addressing trade name infringement). Therefore, generic terms and terms that are merely descriptive are not protectable. The significance of the assignment of a mark to one of

the four categories "cannot be over-emphasized since, ... once a determination has been made, it *may* bring a party's case to a halt, precluding the presentation of other evidence." [7] *Union Nat'l Bank of Texas, Laredo v. Union Nat'l Bank of Texas, Austin,* 909 F.2d 839, 842 n. 6 (5th Cir.1990) (emphasis in original).

The categorization of a mark is far from a precise science. Courts typically analyze a number of factors before reaching a conclusion.

■ One factor to be considered is whether the mark has been registered with the United States Patent and Trademark Office. "Generic terms may never be registered as trademarks under the Lanham Act. 15 U.S.C. § 1052(e). Descriptive terms may not be registered as trademarks under the Lanham Act, unless the holder shows that the mark has acquired 'secondary meaning.' 15 U.S.C. § 1052(e)(1), (f) . . . ." *Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 328 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). The Lanham Act provides:

A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated in the certificate.

15 U.S.C. § 1057(b). Registration of the mark therefore provides the plaintiff with a presumption that the mark is "not merely descriptive or generic, or, if merely descrip-

tive, is accorded secondary meaning. This presumption may, of course, be overcome by proof of descriptiveness, or by proof of genericness." [8] *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 935 (7th Cir.1986) (citations omitted). The Eleventh Circuit has noted that the rebuttable presumption created by Section 1057(b) does not affect the ultimate burden of proof to be carried by the plaintiff. *Freedom Sav. and Loan Ass'n,* 757 F.2d at 1182 n. 4.

As the Eleventh Circuit observed in *Dieter,* additional protections are available to a plaintiff five years after the mark is registered.

Five years after registering a mark, the holder may file the affidavit required by § 1065 and have its mark declared 'incontestable.' 15 U.S.C. § 1065(3). Once a mark has become 'incontestable,' its validity is presumed, subject to certain enumerated defenses which are not applicable in this action. 15 U.S.C. § 1065. Once a mark has achieved 'incontestable' status, its validity cannot be challenged on the grounds that it is merely descriptive, even if the challenger can show that the mark was improperly registered initially.

*Dieter,* 880 F.2d at 328 (footnote omitted). However, the mark may still be challenged on the basis that it is generic. 15 U.S.C. § 1065(4).

Therefore, if a mark has been registered for five years or less, the plaintiff is entitled to a rebuttable presumption that its mark is at least descriptive with secondary meaning. If the defendant provides evidence that the mark is generic or merely descriptive, the plaintiff must go beyond evidence of registration to establish the existence of a protectable interest. Once five years have passed

---

**7.** The Fifth Circuit went on to note:

We do not think that the trademark law is so clear that the interests it is meant to protect will be served in most cases without a thorough presentation of the evidence on *all* of the issues. Therefore, it will be the exceptional case which may be disposed of on these grounds. Since, as we observed above, the likelihood of confusion is the essential concern in trademark law, no purpose is served, unless the mark is found to be generic, by eliminating

a case on this ground if in fact consumers are likely to be confused.

*Union Nat'l Bank,* 909 F.2d at 842 n. 6. The Fifth Circuit's concerns seem particularly meritorious in the early stages of litigation.

**8.** In *Liquid Controls,* the court noted that plaintiff could not rely fully on its registration to establish the existence of a protectable interest. Rather, the presumption "bursts" once the defendant presents sufficient evidence. 802 F.2d at 937 n. 2.

and the mark has achieved incontestable status, the mark is conclusively presumed to be at least descriptive with secondary meaning. The defendant may defeat the presumption only by proof of genericness. *See generally,* 1 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.16 (3d ed. 1992).

■ In an attempt to determine whether a mark is descriptive or suggestive, the Eleventh Circuit has used a variety of "tests." A dictionary definition may be used as " 'an appropriate and relevant indication' of the ordinary significance and meaning of words 'to the public.' " *Vision Center,* 596 F.2d at 116 n. 13 (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir.1974)). *See also Investacorp,* 931 F.2d at 1523 (plain dictionary definition is probative of the descriptiveness of a mark). *But see Union Nat'l Bank,* 909 F.2d at 841 (noting that dictionary definitions are relevant but not dispositive and referring to certain deficiencies in dictionary definitions). Another test used to distinguish between descriptive and suggestive marks is whether competitors in the same industry would be likely to need the mark to describe their products or services. *Vision Center,* 596 F.2d at 116.

■ Once again focusing on competitors, courts have also considered the extent to which a mark is used by third parties in the same industry.[9] *Investacorp,* 931 F.2d at 1523; *Union Nat'l Bank,* 909 F.2d at 848; *Vision Center,* 596 F.2d at 116. In considering third party usage, a court may consider the likelihood of prospective use by competitors. *Investacorp,* 931 F.2d at 1523. If the court has determined that the term or terms at issue are indispensable to the industry, it is likely that competitors will need to use the term or terms. *Id.* Additionally, a court may consider the popularity of actual use. *Id. But see Union Nat'l Bank,* 909 F.2d at 848 n. 25 (suggesting that a plaintiff should be able to protect the precise arrangement of

the components of the mark, even if one component is popular within the industry).

■ When analyzing the component parts of a mark in isolation, there is some risk that the "distinctiveness of the words in combination will be overlooked." *Vision Center,* 596 F.2d at 116. "[C]ommon or ordinary words can be combined in a novel or unique way and thereby achieve a degree of protection denied to the words when used separately." *Id. Accord Liquid Controls,* 802 F.2d at 938.

■ In determining whether a term is generic or descriptive, arguably a court may use the same tests set forth in the cases distinguishing between suggestive and descriptive marks. The process of categorization continues to be far from precise. As one court has observed:

> The distinction between generic and descriptive marks is a matter of degree. '[A] generic term conveys information with respect to the nature or class of an article, whereas a descriptive term identifies the characteristics and qualities of the article, its color, odor, functions, dimensions or ingredients.' [3 Callman, Unfair Competition Trademarks and Monopolies (3d ed.) ] § 70.4 'In a sense, a generic designation is the ultimate in descriptiveness.' 1 McCarthy, Trademarks and Unfair Competition, § 12.5.

*Imported Auto Parts Corp. v. R.B. Shaller & Sons, Inc.,* 258 N.W.2d 797, 800 (Minn.1977) (addressing trade name infringement).

■ Since ICAA has registered its marks, it is entitled to a rebuttable presumption that its marks are at least descriptive with secondary meaning. ICAA goes further and argues that its marks are arbitrary. ICAA's argument is that it requires imagination for the consumer to realize that the air produced upon installation or repair of automobile air conditioning is not really the same temperature that is required to freeze water. Rather, the air produced is comfortably cool.

---

9. The inquiry into third party usage at this stage of the analysis is limited to use within the same industry. Once the plaintiff has established the existence of a protectable interest, the Court must consider the likelihood of confusion with the allegedly infringing product or service. In that analysis, the court may consider all third party use, not just use in the same industry, to determine whether a mark is weak or strong. *See Union Nat'l Bank,* 909 F.2d at 848 n. 24.

Relying simply upon the ordinary usage of the terms at issue, the Court rejects ICAA's argument. The Court is persuaded that consumers who are offered ice cold beverages expect a refreshingly cool drink, not one which is frozen solid. Similarly, most people understand immediately that a person whose hands are "ice cold" does not have frozen hands. Although the Court rejects ICAA's argument that the marks are suggestive, ICAA is still entitled to a presumption that the marks are descriptive with secondary meaning.

Defendants have attempted to defeat ICAA's presumption by providing evidence that the marks are generic or merely descriptive. The Court finds that the following terms are some of the generic terms that describe the basic nature of the principal service offered by the parties: air conditioning service, air conditioning installation, air conditioning repair, auto air conditioning service, auto air conditioning installation and auto air conditioning repair. The terms "cold air" and "ice cold air" describe a characteristic of the service of the parties. Therefore, the Court rejects the Defendants' argument that ICAA's marks are generic.

The question that remains is whether ICAA's mark is descriptive with secondary meaning or merely descriptive. To establish that the mark is merely descriptive, Defendants have produced several pages of advertisements from the yellow pages. The advertisements appear to offer the same generic service as ICAA. The words "auto air" and "cold auto air" appear to be common to the industry.

However, in this case, the Court is concerned that analyzing the component parts of ICAA's marks may cause the Court to overlook the distinctiveness of the words in combination. The Court finds that "Ice Cold Auto Air" and "Ice Cold Air" are more distinctive in combination than are the component parts of the marks. Therefore, the Court is primarily interested in those third party uses within the same industry that strongly suggest, not that the component terms are common to the industry, but that the combined terms of ICAA's marks are common to the industry. Some of the businesses with advertisements in the yellow pages provided by Defendants either are third parties using "Ice Cold Auto Air" independently of ICAA or are sublicensees of Plaintiff Ice Cold Auto Air, Inc. Since it is not clear which is the case, the Court cannot determine how much weight to give Defendants' evidence of third party usage.

ICAA has provided the Court with some evidence of secondary meaning, including use of the marks for a number of years at various locations and at least $2,000,000 spent on advertising. ICAA has also provided some anecdotal evidence that consumers consciously connect the marks with its business. Although the parties may, over time, refine and expand their evidence on these issues, at this point it appears to the Court that ICAA is likely to be able to establish at trial that its marks are descriptive with secondary meaning.

There is one additional threshold issue raised by Defendants. The Fifth Circuit has noted that "two marks must bear some threshold resemblance in order to trigger inquiry into extrinsic factors, but this threshold is considerably lower than the degree of similarity required where the plaintiff presents little or no evidence on extrinsic factors supporting infringement." *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 189 (5th Cir.1981). As the analysis set forth below will demonstrate, the threshold level of similarity required to trigger inquiry into the other factors was satisfied here.

### b. Likelihood of Confusion

Once the threshold question of whether the mark is distinctive enough to deserve protection is answered affirmatively, the court must turn to the central inquiry in an infringement case. Specifically, the court must determine "whether there is a 'likelihood of confusion' between the names and symbols used by the two parties." *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1179. In the Eleventh Circuit there are primarily seven factors to consider in deciding whether

there is a likelihood of confusion.[10] The factors include: 1) the type of mark at issue; 2) similarity of mark; 3) similarity of products or services; 4) identity of purchasers and similarity of retail outlets; 5) similarity of advertising campaigns; 6) the defendant's intent; and 7) actual confusion. *Id.* at 1182–83. Rather than simply determining whether a majority of these factors indicate a likelihood of confusion, a court must "evaluate the weight to be accorded the individual factors and then make its ultimate decision." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir.1986) (analyzing the factors in the context of a trade dress infringement claim). In its ruling on the likelihood of confusion, a court is not required to specifically mention each of the seven factors in order to avoid reversal on appeal. *Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir.1985) (analyzing the factors in the context of a claim of unfair competition). An analysis of fewer than all seven factors may support a finding of likelihood of confusion. *Id.* at 1543. In the Eleventh Circuit, the type of mark and evidence of actual confusion are the most important factors. *Dieter*, 880 F.2d at 326.

## 1. Type of Mark

In analyzing the type of mark, a court must determine whether the mark is strong or weak in order to determine the level of protection to be extended to the mark. In *Freedom Savings and Loan Association*, the Eleventh Circuit explained:

The more distinctive a plaintiff's servicemark, the greater the likelihood that consumers will associate the registered trademark and all similar marks with the registered owner. The law therefore provides the greatest protection to strong and distinctive servicemarks; the strength of a mark depends on the extent of third party usage and the relationship between the name and the service or good it describes.

757 F.2d at 1182. Extensive use by third parties[11] suggests that there would be no likelihood of confusion between the plaintiff and the alleged infringer. *Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981). In analyzing the relationship between the name and the service or good it describes, the Court again considers the proper categorization of the mark.[12] Suggestive and arbitrary marks are considered to be the most distinctive marks, and, as relatively strong marks, entitled to the strongest protection. Descriptive marks are much weaker, but may still be entitled to some protection. *Chassis Master Corp.*, 610 F.Supp. at 476. A registered mark which has achieved incontestable status is presumed to be "at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter*, 880 F.2d at 329.

Defendants have provided evidence of registrations within the state which begin with "ice" or with "cold." Registrations may pro-

---

**10.** In some cases, courts may find other factors to be relevant. The Fifth Circuit has considered the degree of care purchasers are likely to exercise when selecting products of the type sold by the parties. *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 189 (5th Cir.1981). Another factor may be the previous contractual or business relations between the parties. *Id.* However, in most instances, previous contractual or business relationships will be considered as a subcategory of "defendant's intent." *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 n. 9 (5th Cir.1984) (addressing trade dress infringement). *Compare Chassis Master Corp. v. Borrego*, 610 F.Supp. 473, 478 (S.D.Fla.1985) (addressing the previous relationship between the parties as a subcategory of intent and finding that such a prior relationship imposes a greater duty to adopt a clearly distinguishable mark) *with Varitronics Systems, Inc. v. Merlin Equipment, Inc.*, 682 F.Supp. 1203, 1206

(S.D.Fla.1988) (listing contractual relations as an entirely separate factor). Finally, "in a case between noncompetitors, it is appropriate to consider the lack of present competition as well as the likelihood that one party will expand its product line to compete with the other." *Falcon Rice Mill, Inc.*, 725 F.2d at 345 n. 9.

**11.** More recently the Fifth Circuit has commented that at this stage in the inquiry, the court should properly consider all third party use, not just third party use in the industry. *Union Nat'l Bank*, 909 F.2d at 848 n. 24.

**12.** The Court previously categorized the mark as part of a threshold inquiry in determining whether plaintiff had any type of protectable interest. At this stage in the analysis, the goal is to determine the degree of distinctiveness of the mark. *See AmBrit, Inc.*, 812 F.2d at 1539 n. 36.

vide evidence of third-party usage. As set forth above, the Court finds that in this particular case, there is a risk in considering merely the components of ICAA's marks rather than the mark as a whole since the terms combined are more distinctive than the individual components. Therefore, registration of the component terms are not as useful as registration of the words in combination. For example, registrations of "ice cold" in combination provide more guidance for the Court. Registration of "ice skating" or some such name does not suggest a likelihood of confusion. Additionally, the Court finds evidence of third party usage in the market area at issue more probative, since the concern is likelihood of confusion in that market area.

As set forth above, based on the evidence presented thus far, the Court finds ICAA's mark to be descriptive with secondary meaning. At this stage in the litigation, the Court finds that ICAA's marks are somewhat weak, but still entitled to some protection.

## 2. Similarity of the Mark

■■■ Another factor increasing the likelihood of confusion is a high degree of similarity between the marks. In comparing similarity, a court should consider the overall impression created by the marks rather than comparing individual features of the marks. *Bellsouth Advertising & Publishing Corp. v. Real Color Pages,* 792 F.Supp. 775, 781 (M.D.Fla.1991). The analysis should include a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed. *Id. See also Chassis Master Corp.,* 610 F.Supp. at 476 (comparing the appearance, pronunciation and suggestion of the marks). The use of an identical word, even a dominant word, does not automatically mean that two marks are similar. *Freedom Sav. and Loan Ass'n,* 757 F.2d at 1183.

In arguing this factor, the parties have tended to combine the analysis required for marks and for trade dress. In *Freedom Savings and Loan Association v. Way,* 757 F.2d 1176 (11th Cir.1985), the court consid-

ered the logos of the parties, in addition to the two marks, since the defendant most often advertised by using its logo in connection with its name. In *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 188 (5th Cir.1981), the court compared a "trademark composed of the brand name 'Native Tan' and a sunburst symbol surrounding a figure resembling the head of a tiki god" with defendant's mark. In the case at hand, the parties have no logo or symbol that is regularly associated with their marks. However, the Court is persuaded that the manner in which the marks are presented to the public in terms of the relative size of the component terms may be relevant to an analysis of the similarity of the marks.

■■■ Defendants have argued that the comparison of marks must include their entire mark, "Cold Air and Accessories." [13] Defendants then argue that there is a significant difference in the appearance, sound and meaning of the marks. However, in virtually all of their signs and on the office letterhead and business cards, the terms "and Accessories" have been de-emphasized by Defendants since they are placed below and are much smaller than the terms "Cold Air." The Court is persuaded that consumers would refer to Defendants' business as "Cold Air," that the presentation of Defendants' mark to the public encourages the public to use the short form "Cold Air," and that Defendants reasonably anticipated such a result. In comparing the short form of Defendants' mark with ICAA's mark of "Ice Cold Air," the Court finds that the marks are very similar. However, ICAA locations primarily use ICAA's other mark, "Ice Cold Auto Air." The presentation of this mark to the public is inconsistent. In some instances, the terms "Auto Air" are larger than the terms "Ice Cold." Taking this difference in presentation into account and considering the appearance, sound and meaning of "Ice Cold Auto Air" and "Cold Air," the Court finds that there is some similarity, but that the level of similarity does not strongly contribute to the likelihood of confusion.

**13.** In presenting their mark to the public, the Defendants have used "and" rather than the am-

persand used in their fictitious name registration with the State of Florida.

### 3. Similarity of Products or Services

■ The greater the similarity between products and services, the greater the likelihood of confusion. *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980). The parties have represented to the Court that their products and services are virtually identical.

### 4. Identity of Purchasers and Similarity of Retail Outlets

"Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers." *AmBrit, Inc.*, 812 F.2d at 1541. The parties appear to agree that the purchasers and retail outlets are very similar.

### 5. Similarity of Advertising Campaigns

"If a plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Am-Brit, Inc.*, 812 F.2d at 1542. A court may properly consider the overall advertising campaigns. *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1185. Defendants argue that ICAA has recently used certain methods of advertising that have served to increase confusion regarding the parties' services. However, the Court finds that the methods of advertising used by both ICAA and Defendants are entirely predictable and ordinary for the type of services offered. The parties now use, and may be expected to use in the future, virtually identical advertising media.

### 6. Defendant's Intent

■ A finding that a defendant adopted a mark with the intent of deriving benefit from the reputation of a plaintiff's service or product may alone be enough to justify an inference that there is confusing similarity. *Am-Brit, Inc.*, 812 F.2d at 1542. Evidence that a defendant intended to come as close to plaintiff's mark as the law would allow may support an inference that a defendant intended to trade on the good will associated with plaintiff's mark. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977–78 (11th Cir.1983). Although intent may be inferred, the actions of defendant must clearly indicate an effort by the defendant to confuse the public. *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 449 (5th Cir. 1973). Without clear evidence of intent, a plaintiff's argument may become circular.

> [The plaintiff] argues that confusing similarity of the marks is proved by the defendants' intent to confuse the public and that the defendants' intent to confuse the public is proved by the confusing similarity of the marks. The obvious flaw in the argument is that it requires the court to assume that which is to be proved.

*Id.*

Given the prior business relationship between the parties, the disputed direct evidence of intent (presented in state court and through affidavits), and the inferences that may be drawn from some of the events that have transpired, it is clear that this factor will be a key one in the final outcome of this case. On the evidence and inferences that have been presented thus far, the Court is not prepared to conclude that this factor alone would entitle ICAA to an inference of confusing similarity. However, analysis of this factor at this stage in the litigation does seem to support a finding of likelihood of confusion.

### 7. Actual confusion

■ " 'Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion.' " *John H. Harland Co.*, 711 F.2d at 978 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.1980)). Actual confusion by a few customers is evidence of likelihood of confusion by many customers. *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1185. Therefore, a plaintiff usually will not have to prove more than a few incidents of actual confusion. *Id.*

ICAA's evidence of actual confusion makes this factor the strongest of the seven. However, the Court could give more weight to evidence of specific events fully documented. The generalizations of ICAA's employees regarding types of confusion do not provide the Court with the most probative evidence.

### c. Conclusion

Admittedly the factors of intent and actual confusion tend to support a finding of likeli-

hood of confusion. ICAA's claim is hindered by the fact that the Court has found on the evidence presented thus far that the marks are entitled to relatively weak protection and that the similarity between "Ice Cold Auto Air" and "Cold Air" is not great. The Court is not prepared to conclude at this point that ICAA has established a likelihood of success on the merits on its claim of infringement of its marks.

## IV. FEDERAL LAW: UNFAIR COMPETITION

### (Trade Dress Infringement)

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

This statutory provision provides a federal cause of action for unfair competition.[14] Specifically, this provision provides a cause of action for trade dress infringement. *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983).

■ In *John H. Harland Co.,* the Eleventh Circuit stated:

'Trade dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.

. . . .

Most trade dress infringement actions involve the packaging or labeling of goods. . . . Recently, however, courts have recognized that the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act.

*Id.* (citations omitted). To prevail on a claim of trademark infringement, a plaintiff must establish three elements: 1) its trade dress is inherently distinctive or has acquired secondary meaning; 2) its trade dress is primarily nonfunctional; and 3) the defendant's trade dress is confusingly similar. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir. 1986).

### a. Inherent Distinctiveness or Secondary Meaning

■ If a "plaintiff's trade dress is not sufficiently distinctive to allow consumers to identify the product from the trade dress, then the dress does not inherently serve as an indication of origin and the plaintiff can claim no right to the exclusive use of that trade dress." *AmBrit, Inc.,* 812 F.2d at 1536. Trademarks and trade dress may be classified as generic, descriptive, suggestive or arbitrary. *Id.* at 1537. Trade dress which is arbitrary or suggestive is inherently distinctive and entitled to protection. *Id.* Alternately, trade dress which is not inherently distinctive may be protectable if plaintiff can establish that the trade dress has acquired secondary meaning, *i.e.,* that the consuming public has come to associate that trade dress with the producer of the service or product. *Id.* at 1536.

---

**14.** There are certain similarities between the analysis required for trademark and servicemark infringement and for unfair competition. However, the unfair competition claim is "broader." *Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). Therefore, failure on the trademark or servicemark claim would not automatically bar an unfair competition claim. *Id.*

At this stage of the analysis, the court should consider the overall impression conveyed by the combination of the various elements of the trade dress. *Id.* at 1537. Isolated or piecemeal third party uses of various elements does not detract from the distinctiveness of the trade dress unless the third party usage is so extensive that it impairs the ability of consumers to use the trade dress to identify plaintiff as the source for the service or product. *Id.*

ICAA's trade dress is not uniform throughout all of its stores. This lack of uniformity suggests that ICAA's trade dress would be unprotectable. Yet in spite of the lack of uniformity in specific details, there appears to be an overall impression that is fairly distinctive. ICAA is likely to prevail at trial in establishing inherent distinctiveness or secondary meaning in their trade dress.

### b. Functionality

Trade dress is protectable only if it is primarily nonfunctional. *AmBrit, Inc.,* 812 F.2d at 1538. The fact that individual elements of trade dress are nonfunctional does not mean that the trade dress as a whole is unprotectable. *Id.* While a defendant is free to copy functional features (assuming no trademark or copyright protection), copying features which are primarily nonfunctional may create liability for infringement. *John H. Harland Co.,* 711 F.2d at 982.

The parties need to focus more particularly on the issue of functionality before the Court can address this element in any detail. The Court is not persuaded that ICAA is attempting to interfere with Defendants' method and style of doing business or attempting to prevent Defendants from using certain marketing approaches as Defendants argue. It appears that this type of concern can be addressed in the analysis of functionality. However, the Court notes that extensive third-party usage of a specific element, while relevant to various aspects of the analysis, does not establish that the element is functional.

### c. Likelihood of Confusion

The factors relevant to determining whether there is a likelihood of confusion between the trade dress of two products is essentially the same as the factors relevant to the likelihood of confusion analysis for trademark or servicemark infringement. *John H. Harland Co.,* 711 F.2d at 981. The key difference is in the second factor. In trademark or servicemark analysis, the second factor is "similarity of mark." In trade dress infringement, the second factor is "similarity of design." *AmBrit, Inc.,* 812 F.2d at 1540. The scope of inquiry into similarity of design is considerably broader and may extend beyond a comparison of the marks involved. *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 192 (5th Cir.1981). *Accord Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.1985) (noting that a comparison of trade dress is one example of the fact that an unfair competition claim is broader than a trademark infringement claim), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985).

A comparison of the similarity of trade dress in this case merits closer analysis than the parties have provided for the Court up to this point. While there are differences in the trade dress for ICAA and Defendants, there is a sense that the overall effect of the trade dress for each is quite similar.

### d. Conclusion

The Court is hindered in its analysis of trade dress because the parties have either not focused on this claim separately in their briefs or have not developed in detail the analysis required by the Eleventh Circuit. No doubt this shortcoming will be remedied by the time of trial. On the record before it, the Court is unwilling to conclude that ICAA has established a likelihood of success on the merits of its trade dress infringement claim.

## V. ICAA'S REMAINING CLAIMS

"Unfair competition occurs when one business entity 'palms off' its products or services as those of another." *Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n,* 651 F.2d 311, 313 n. 2 (5th Cir.1981).

940

The Court has already concluded that ICAA has not established a likelihood of success on the merits of their federal statutory claims based on the evidence available at this time. For similar reasons, ICAA has not established a likelihood of success on the merits on its common law unfair competition and common law palming off claims.

 In addressing state trademark dilution under Florida Statutes § 495.151, the Eleventh Circuit has noted:

Dilution, like unfair competition, is a broader claim than infringement.

. . . .

Dilution requires some proof that the use of a trademark decreases its commercial value. If the plaintiff holds a distinctive trademark, it is enough that the defendant has made significant use of a very similar mark. On the other hand, where the mark is a weak one that lacks much distinctiveness, the mere use of a similar mark will not establish loss of commercial value.

*Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.1985) (citations omitted). Based on the analysis under ICAA's infringement claim, the Court finds that ICAA has not established a likelihood of success on the merits of its claim of dilution.

On the issue of ICAA's claim that Mr. Powalisz has violated a non-compete agreement, the Court finds there are unresolved issues regarding contract interpretation. These unresolved issues lead to the conclusion that ICAA has not established a likelihood of success on the merits.

With respect to ICAA's claim that Mr. Powalisz has violated the Uniform Trade Secrets Act under Florida Statutes § 688.-001, the Court finds that on the evidence presented to the Court at this time, ICAA has not established a likelihood of success on the merits.

Accordingly, it is hereby ORDERED as follows:

1. Plaintiffs' Motion for Preliminary Injunction (Dkt. 8), filed March 5, 1993, is DENIED.

2. Defendant's (sic) Motion to Strike (Dkt. 49), filed March 10, 1993, is DENIED.

3. Defendant's (sic) Supplemental Motion to Strike (Dkt. 73), filed March 11, 1993, is DENIED.

4. The parties shall prepare for trial on an expedited basis. The deadlines related to discovery and trial shall be set by separate Order of the Court.

DONE AND ORDERED.