**AMERICAN FOOTWEAR CORPORATION, Plaintiff-Appellee,**

v.

**GENERAL FOOTWEAR COMPANY LIMITED, Defendant-Appellant,**

and

**Universal City Studios, Inc., Intervening-Defendant-Appellant.**

**No. 505, Docket 78–7362.**

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1979.

Decided Nov. 9, 1979.

---

Evan L. Gordon, New York City (Wofsey, Certilman, Haft & Lebow, Barry J. Bendes, New York City, Rosenfeld, Meyer & Susman, William J. Billick, III, Beverly Hills, Cal., of counsel), for defendant-appellant.

Lawrence Rosenthal, Blum, Moscovitz, Friedman & Kaplan, New York City, for plaintiff-appellee.

Before WATERMAN, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

WATERMAN, Circuit Judge:

Defendant-appellant General Footwear Company Limited (General) and intervening defendant-appellant Universal City Studios, Inc. (Universal) appeal from an interlocutory judgment entered in the United States District Court for the Southern District of New York, Carter, *J.*, granting plaintiff-appellee American Footwear Corporation (American) an injunction against infringement of its trademark "Bionic" in connection with the promotion and sale of footwear. The judgment appealed from enjoins General and Universal from asserting exclusive rights to use of the term "Bionic" in connection with the promotion and sale of footwear, but in no way interferes with Universal's trademark rights in its T.V. shows or its licensing operations in respect thereto.

The district court found that inasmuch as Universal had not registered or applied for registration of "Bionic" as a trademark prior to the time American selected the mark and applied for registration no statutory trademark issues were involved. Relying primarily upon American's priority of use, the lower court concluded that American established its right to use "Bionic" in connection with the promotion and sale of its footwear, and therefore, as a result of Universal's "Buyers Beware" advertisement, designed to create the impression that American was guilty of trademark infringement, American had suffered irreparable injury. Based upon the foregoing facts, the court determined that American had established its entitlement to an injunction against Universal for trademark infringement and unfair competition.

Universal and General argue that enjoining them from licensing or using the word "Bionic" in connection with the promotion and sale of footwear because of American's prior use of the word constitutes an inequitable restriction upon a creator's use of a fanciful term and contend that they are entitled to an injunction against American based on American's unfair competition in attempting to capitalize upon the success of Universal's T.V. shows by misappropriating an essential element thereof in the word "Bionic." Defendants-appellants also contend that American failed under recognized principles of trademark law to establish any of the criteria necessary for the issuance of the injunction granted to it by the district court and urge the dissolution of that injunction.

We are in agreement with the defendants-appellants' contention that American failed to establish the necessary elements for issuance of an injunction and hereby order its dissolution. As to the appellants' contention that they are entitled to an injunction restraining American, we find that, because appellants failed to establish a likelihood of confusion such that a substantial number of ordinarily prudent purchasers might be misled into mistakenly purchasing American's footwear, American's usage of the trademark "Bionic," although admittedly adopted to capitalize on public receptiveness to a word Universal was responsible for popularizing, does not establish a case of unfair competition or trademark infringement entitling them to enjoin American's use of the word "Bionic" in connection with the promotion and sale of its hiking boot.

This action, a suit for declaratory relief brought in the New York Supreme Court, was initiated on July 30, 1976, by American against General, which, pursuant to license from Universal, was using "Bionic" in the manufacture and sale of inexpensive children's sneakers. On August 13, 1976, General, however, removed that action to the United States District Court for the Southern District of New York and on September

20, 1976, commenced a separate action against American in the United States District Court. Universal was granted leave to intervene in both actions. Subsequently the two actions were consolidated for all purposes.

The consolidated action contains the claims by American as plaintiff in its suit against General and Universal for common law trademark infringement, unfair competition, and tortious interference with business relations, and also the claims Universal and General assert against American in their action for common law and statutory trademark infringement, unfair competition, false designation of origin, passing off, and dilution.

The events leading up to the present controversy are lengthy and involve numerous peripherally related facts which will not be discussed at length. Beginning in January 1974 Universal, a television and motion picture studio, began what became an immensely popular T.V. series entitled "The Six Million Dollar Man." The story line of this series concerned the adventures of a "bionic" man who, after a catastrophic accident, had been restored by a team of doctors through the use of numerous artificial limbs and organs. As a result, the "bionic" man possessed great physical strength and powers. This series was followed by another with a similar theme featuring a "bionic" woman, first aired in January 1976 under the title of "The Bionic Woman." Universal has applied for or registered numerous trademarks having reference to these two television shows in the fields of entertainment and of toys, and has begun a vigorous merchandising campaign exploiting the popularity of these two television programs. As of January 1976, however, its only registered mark was for "The Six Million Dollar Man" in the field of entertainment services.

In the fall of 1975 American, through its sister company Anwelt Corp., designed a multipurpose hiking boot. The trademark "Bionic Boot" was adopted for the hiking boot in January 1976, at a brainstorming session of the American staff. It is undisputed that the idea for the trademark was generated from the highly popular television series "The Six Million Dollar Man," where the hero is sometimes referred to as the "Bionic" man.

American searched the records of the U. S. Patent and Trademark Office to ascertain whether "Bionic" had been registered as a federal trademark on footwear or whether there were any pending applications so to register. American was advised that the mark "Bionic" was available for registration and that while "Bionic" or other related terms had been used as trademarks for various goods, the mark "Bionic" had never been registered or applied for in connection with footwear. American, therefore, went ahead with its plans to use "Bionic" as a trademark and displayed the boot under that mark at the New York Shoe Fair in February 1976. The trademark "Bionic" by American was affixed to the heel pad of the boot and was prominently displayed on the box.[1] American's application for federal registration of the trademark "Bionic" was filed on June 9, 1976. The first customer orders for the boot were dated February 1976, and the first shipment to customers was in July 1976. "Footwear News" also featured American's "Bionic Boot" in its April 26, 1976 supplement.

Beginning in December 1975 Merchandising Corporation of America, Inc. (Merchandising), the commercial arm of Universal, began negotiations with General concerning commercial exploitation of its "The Six Million Dollar Man" series in the footwear field. Although some agreement was reached in March 1976, the district court found that the earliest date at which a license was effectuated was sometime subsequent to October 4, 1976. The court held

---

1. American affixes its trademark to its boots on a heel pad as follows:

BIONIC TM
BY
AMERICAN

The gummed label affixed to the box in which the "Bionic Boot" is sold reads as follows:

BIONIC TM BOOT
BY
AMERICAN

that "[t]he licensing agreement as proposed and as finally agreed upon always refer[s] to Six Million Dollar Man and Bionic Woman, and at no time is there any reference to a trademark Bionic or to licensing the use of Bionic alone or indeed licensing anything separate and apart from the TV shows mentioned." (Joint Appendix at 15.)

As a result of the article in "Footwear News" featuring American's "Bionic Boot," Universal's subsidiary, Merchandising, sent a letter dated June 25, 1976, to American charging trademark infringement. Thereafter on July 26, 1976, Merchandising published in "Footwear News" a "Buyers Beware" advertisement which stated that Universal alone had the right to use "Bionic" as a trademark and charged trademark infringement against all who used the mark without its permission.

At the outset of its opinion the district court found that Universal had not registered or applied for a registration of "Bionic" as a trademark for any goods prior to the time American selected the mark and applied for its registration and accordingly it held that no statutory trademark issues were involved. The district court recognized that:

> It was entirely permissible for American to attempt to capitalize on public receptiveness to a concept, idea or word which Universal has been responsible for creating or popularizing. The only limitation is that the party who takes advantage of the atmosphere the other party has

helped create may not achieve a competitive boost by confusing the public into mistakenly purchasing his articles believing it to be that of his competitor. (citation omitted). American has not been guilty of that fault. It has at all times made clear that the Bionic boot it was attempting to promote was an American product. No effort of any kind was made to associate the boot with Universal's TV shows or with any of the characters in those shows. (Joint Appendix at 17–18.) [2]

The court concluded, therefore, that the real issue in that controversy was whether Universal through its T.V. shows had foreclosed use in the marketplace of "Bionic" or "Bionics" by others. The court held that "Bionic" as used by American was an arbitrary mark, whereas its use by Universal was a descriptive term (i. e., bionic man, bionic woman, bionic boy, bionic dog),[3] and Universal had therefore failed to establish a right to be accorded use priority over American, citing *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2 Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

Additionally, the court held that "[t]he word bionic has not been shown to have acquired a secondary meaning so that the public associates the term with Universal or its TV series" (Joint Appendix at 18). In so holding the court rejected survey evidence introduced by Universal that purported to demonstrate public association between the word bionic and the T.V. series.[4]

**2.** Appellants dispute this finding by the district court. They contend that American's intent to capitalize upon the popularity of Universal's television shows was evidenced by a poster, showing a woman in a running pose similar to the running pose adopted by Universal's theme characters in the opening segments of each episode of "The Six Million Dollar Man" and "The Bionic Woman," which was employed by American as part of the advertising display promoting its "Bionic Boot" at the National Shoe Fair held in New York City in February 1976. On the other hand, conceding that American's "Bionic Boots" were not designed to be the functional equivalent of track shoes, an advertisement for footwear does lend itself to a running pose. Moreover, the similarities between the poster and the scenes from the T.V. shows are not so marked that, when the

poster is displayed together with numerous and prominent references to American and to no other entity, an ordinarily prudent purchaser would be likely to be misled into believing that any sponsorship arrangement existed between Universal's T.V. shows and American's product.

**3.** That is to say, Universal's usage of the adjective "bionic" was intended to correspond with that term's dictionary meaning, "concerning the science of designing instruments or systems modeled after living organisms."

**4.** At trial Universal offered two surveys conducted under the supervision of Dr. Russell Haley, a telephone survey and a shopping center survey.

Universal and General concede that if the term, *i. e.*, word, "bionic" had been used in its descriptive dictionary sense in relation to a product whose functional use would correspond to that descriptive sense, Universal has not foreclosed the use of such a term by others in the marketplace; but they argue that the court, in denying their application for an injunction, misapprehended the nature of their claim. First, Universal argues that it has foreclosed the use of the "television word Bionic" to others due to its efforts and skills in developing and popularizing the word through the television series in which the word is used as part of the title of one of the series and is used as an adjective describing both major characters. Universal contends that this issue before the court is not whether the product is identified as being made by American, but whether the public could confuse the source of the product's sponsorship and purchase it because of a belief that it had some connection with Universal's television series.

Secondly, appellants argue that Universal's use of the terms "Bionic Man" and "Bionic Woman" on products marketed by its licensees was, contrary to the finding of the district court, arbitrary trademark use, so that Universal is entitled to protection against a subsequent user of an identical mark, citing *Triangle Publications v. Rohrlich,* 167 F.2d 969, 972 (2d Cir. 1948); *LeBlume Import Co. v. Coty,* 293 F. 344, 358–59 (2d Cir. 1923); *National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 747–48 (S.D.N.Y.) *aff'd* 497 F.2d 1343 (2d Cir. 1974). Also, appellants contend that if Universal's use of the word "bionic" is merely descriptive, the word has acquired a secondary meaning and appellants are thereby entitled to equitable protection.

The essence of Universal's and General's claim of unfair competition and trademark

The telephone study was conducted on a national probability sample of individuals 16 years of age or older. 802 individuals were asked a single question: "With whom or what do you associate a product labelled Bionic?" Of the 802 interviewees 34.7% gave no associational response whatsoever and 55% associated a product labeled Bionic with Universal's television shows or their principal characters. Although the latter percentage may be significant, the form of the survey question was too self-serving, in that the more relevant inquiry should have been "With whom or what do you associate a 'Bionic' boot?" *See American Basketball Association v. AMF Voit, Inc.,* 358 F.Supp. 981, 986 (S.D.N.Y.), *aff'd* 487 F.2d 1393 (2d Cir. 1973), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974).

The second study, the on-site shopping center survey, involved 307 personal interviews in six shopping centers throughout the country. Each of the interviewees was shown an American promotional poster for the "Bionic Boot," and was then asked: "With whom or what do you associate the term Bionic Boot?" Out of the 307 persons interviewed 74.3% identified the poster as being connected with Universal's "The Six Million Dollar Man" or "The Bionic Woman" television series or with their principal characters. Assuming that this percentage is high enough to be significant, the critical defect in this survey was the failure to conduct it under actual marketing conditions. Whenever American had displayed this poster at various shoe fairs or industry trade shows, the poster always was shown in an environment replete with references to American as the seller of the boot. However, once removed from this environment, the poster differed from American's other "Bionic Boot" advertisements in that the poster itself did not contain any references to American. This defect was pointed out by the district court during Dr. Haley's testimony, the court stating:

> . . . one of the issues in the case is the possibility of confusion on the part of the consumer, so it seems to me that using the advertisement in the form that the defendant finds objectionable . . . would get a more accurate response as to whether or not there is the likelihood of confusion with the defendant's product than leaving it off.

(Joint Appendix at 698–99); *see American Luggage Works, Inc. v. United States Trunk Co.,* 158 F.Supp. 50, 53 (D.Mass.1957) (Wyzanski, J.), *aff'd sub nom. Hawley Products Co. v. United States Trunk Co.,* 259 F.2d 69 (1st Cir. 1958). Moreover, the survey participants, although former purchasers of hiking boots, did not necessarily have any present purchasing interest concerning the particular matter being surveyed. As noted by Judge Wyzanski in *American Luggage Works, Inc., supra,* 158 F.Supp. at 53, "Many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash," quoted approvingly in 259 F.2d at 78.

Accordingly, in light of these methodological defects, the district court's rejection of this survey evidence was not clearly erroneous.

infringement is the adoption by American of the "television word" bionic. In support of their alternative theories of recovery, appellants cite: *Triangle Publications v. Rohrlich, supra; Lone Ranger, Inc. v. Cox,* 124 F.2d 650 (4th Cir. 1942); *National Lampoon, Inc. v. American Broadcasting Cos., Inc., supra* ; and *Wyatt Earp Enterprises v. Sackman, Inc.,* 157 F.Supp. 621 (S.D.N.Y. 1958), all of which stand for the proposition that the public, through associating a name or symbol with a particular sponsorship, can be misled as to sponsorship of a product by the overt use by another party of that name or symbol. Hence, appellants reason that if Universal had in fact established a protectable right in the terms "Bionic Man" or "Bionic Woman" then, under principles of trademark law, American has infringed by the use as the dominant portion of its mark, the portion, "bionic," which most clearly identifies the sponsor of the goods, and therefore American should have been enjoined from the use of "bionic."

Although at one time the law of unfair competition was limited to claims that one party had attempted to pass off his goods as those of another party, unfair competition is now held to encompass a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another. *Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 781 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); *Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc.,* 443 F.Supp. 291, 305 (S.D.N.Y. 1977). "[O]ne cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is 'sponsored' by or derived from something else." *Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc., supra* at 305. Yet, liability in this area for misimpression or misappropriation has been limited. For example, one can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competi-

tor. *Philip Morris, Inc. v. R. J. Reynolds Tobacco Co.,* 188 U.S.P.Q. 289 (S.D.N.Y. 1975). All the cases in this area which appellants rely upon involved proof of a substantial secondary meaning in plaintiff's arbitrary trademark, *Triangle Publications v. Rohrlich, supra* (secondary meaning in mark "Seventeen"), or bad faith predatory conduct justifying relief, *Lone Ranger, Inc. v. Cox, supra* (bad faith); *HMH Publishing Co., Inc. v. Brincat,* 504 F.2d 713 (9th Cir. 1974) (bad faith). *See also Lincoln Restaurant Corp. v. Wolfies Restaurant, Inc.,* 291 F.2d 302 (2d Cir. 1961) (deliberate attempt to create name-association). Here the district court found that there was no proof that American's advertising was built thematically around Universal's television shows, or that American played down its own name to inspire confusion, or that American acted in any other way except by the use of the word "bionic" to suggest any association with Universal's television enterprise. In fact, appellants concede that Universal's merchandising program uses the term "bionic" *to describe* many products sold under "The Six Million Dollar Man" mark and the "Bionic Woman" mark; therefore, in view of this descriptive usage there would be no apparent reason for a consumer to assume that because the boots bore the mark "Bionic" the creators of "The Six Million Dollar Man" or the "Bionic Woman" were automatically engaging their creations in the sponsorship of hiking boots. Additionally, there was no evidence of prior dealings between American and Universal as in *Wyatt Earp Enterprises v. Sackman, Inc., supra,* and *National Lampoon, Inc. v. American Broadcasting Cos., Inc., supra,* which might tend to support a conclusion that American adopted "Bionic" for the purpose of suggesting an association with Universal's television series. Therefore, while American certainly intended to capitalize on Universal's popularization of the word "bionic," we find that it did not so capitalize by confusing consumers.

Challenging the findings of the district court, appellants also contend that by virtue of Universal's efforts in promoting its tele-

vision programs the word "bionic" has come to be equated with the notion of enormous strength and superhuman ability as opposed to its dictionary definition ("The science of designing instruments or systems modeled after living organisms") and has, therefore, acquired a secondary meaning.

We previously have discussed the district court's disposition of this argument. Although we do not subscribe to the view, arguably implicit in the district court's reasoning, that survey evidence gathered for later use in litigation invariably is suspect and not relevant to the issue of secondary meaning, *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381 (7th Cir. 1976), we are of the opinion that, in view of the numerous deficiencies inherent in the surveys here, the district court's rejection of this survey evidence was not clearly erroneous. *See* footnote 4, *supra.*

The doctrine of secondary meaning requires not only that the mark have a subordinate meaning, but also that the *primary* significance of the mark in the minds of the consumers is the identification of the producer, not a designation of the product. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *Spang v. Watson*, 92 U.S.App.D.C. 266, 205 F.2d 703 (D.C. Cir.), *cert. denied*, 346 U.S. 938, 74 S.Ct. 378, 98 L.Ed. 426 (1954); *Bliss-craft of Hollywood v. United Plastic Co.*, 189 F.Supp. 333 (S.D.N.Y.1960), *aff'd in part, rev'd in part on other grounds*, 294 F.2d 694 (1961). So, when a company causes the public to associate a certain word with that company's business, that word has a secondary meaning and receives the full protection of the law of trademark and unfair competition. The crucial question in a case involving "secondary meaning" always is whether the public is moved in any degree to buy an article because of its source. *See Wyatt Earp Enterprises, Inc. v. Sackman, Inc., supra.* Proof of secondary meaning is often difficult inasmuch as no precise guidelines are applicable and no single factor is determinative. Each case must, therefore, be decided on its facts with consideration given to such elements as the length and exclusivity of use, sales levels, and extent of advertising and promotion. The fact that Universal has succeeded in popularizing the word "bionic," and cultivated public acceptance of a relatively unknown word, while sufficient to support a finding of distinctiveness, *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1359 (E.D.Pa.1972), *aff'd*, 480 F.2d 917 (3d Cir. 1973); *Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905, 912 (D.N.J.1976), is insufficient to support a finding of secondary meaning. Furthermore, the fact that Universal invested in excess of $20,000,000 in the production of its television shows and received royalties in excess of $10,000,000 from its merchandising program, as compared with American's minimal advertising expenditures in the promotion of its "Bionic Boot" (approximately $3,000), while relevant to the issue of secondary meaning, is certainly not dispositive. *HMH Publishing Co. v. Brincat, supra* at 719. For just as the expenditure of large sums of money does not in and of itself create legally protectable rights, so, too, the mere presence of extensive advertising does not assure the existence of a likelihood of confusion. *HMH Publishing Co. v. Brincat, supra.* Appellants' survey relative to consumer reactions to boots labeled "Bionic" only demonstrated a generalized linkage with Universal's television programs and did not demonstrate the existence of any consumer confusion as to sponsorship or source of manufacture. Such is insufficient to establish a secondary meaning in the word.

Appellants' trademark theory of recovery is no more persuasive than its misappropriation theory. It overlooks the well-established principle that trademark rights, unlike statutory copyrights or patents, are not rights in gross or at large. "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). The right, therefore, to exclusive use of a trade-

mark derives from, and is limited by, its actual use in the marketplace. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). The test, under both the Lanham Act and the common law, is the likelihood that the consuming public will be confused as to the source of the allegedly infringing product. *See Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D. N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978); *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538 (2d Cir. 1956). As has often been observed, the law of trademark infringement is but a part of the law of unfair competition, *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and the same test is applied in determining each claim. For confusion to arise, the markets need not be identical, *Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976), but the similarity of the markets or products is a factor meriting the consideration of the likelihood of confusion. *Mushroom Makers, Inc. v. R. G. Barry Corp.*, *supra.* The trademarks registered to Universal were in the areas of T.V. entertainment and toys. This market area bears little if any relationship to footwear, and diminishes the strength of Universal's contention that it had established a right to the term "bionic" as a fanciful mark in the field of footwear. Yet, as recognized by the district court, the fact that Universal had not utilized the mark, registered it, or applied for the mark on footwear is not decisive of the issue, for a trademark owner has a right to protection against the use of the mark by third parties on related non-competing goods. The district court determined that American, by virtue of the fact that it was the first user of the arbitrary mark "Bionic" in connection with the promotion and sale of footwear, as contrasted with Universal's purely descriptive use of the term bionic, had established its entitlement to an injunction against Universal and General for trademark infringement and unfair competition and Universal's "Buyers Beware" advertisement was the basis of the court's finding that American

had suffered irreparable injury. This finding, coupled with the court's conclusion that American had acquired common law trademark rights to "Bionic" in the field of footwear, constituted the factual and legal bases for the award of injunctive relief. Also, the court held that under the standards set forth in Polaroid Corp. v. Polarad Electronics Corp., *supra*, 287 F.2d at 495, Universal had failed to establish a right to be accorded priority over American in the area of the merchandising of footwear.

The question of whether a senior user is entitled to protection against a junior user on non-competitive goods was addressed by this court in *Polaroid Corp. v. Polarad Electronics Corp.*, *supra*. The factors suggested in *Polaroid* include, but are not limited to:

> [T]he strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp. v. Polarad Electronics Corp.*, *supra*, 287 F.2d at 495.

 It has long been established in this circuit that the mere fact of seniority alone does not entitle the first user of a trademark to injunctive relief. The determination is to be made on the basis of the equities involved, and thereby requires an evaluation of the legitimate interests of the senior user, the junior user, and the consuming public. *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964). Therefore, to the extent that American sought relief for trademark infringement under the Lanham Act, 15 U.S.C. § 1114, it was necessary for it to prove the elements of trademark infringement. *See Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.)*, *supra; Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. dismissed*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *Polaroid Corp. v. Polarad Electronics Corp.*, *supra*. American has

clearly failed to meet this burden. First, "Bionic" is a relatively new mark and therefore could not be considered a particularly strong mark in the marketplace. Second, there is little comparability between the expensive hiking boots sold by American and the inexpensive children's sneakers sold by Universal's licensee, General. The dissimilarities in the products (*i. e.*, hiking boots vs. children's sneakers) also have an indirect bearing on the marketplace sophistication of buyers inasmuch as the purchasers of American's hiking boot undoubtedly are not motivated by the same considerations as purchasers of "The Six Million Dollar Man" or "Bionic Woman" "Bionic Sneakers." American has not brought its case within the *Polaroid* factors. American, the senior user, is not "bridging the gap." It is Universal, the junior user, which is expanding into new fields (*i. e.*, footwear) and not American. As to the quality of General's product, American made no claim in the court below and none here that it was concerned with General's competition in manufacturing and selling children's sneakers. And, finally, American presented no evidence on the crucial issue, essential to sustain a finding of trademark infringement, of whether there was likely to be consumer confusion by the use of the mark by Universal and General. In fact, the only evidence presented on the issue of consumer confusion was the survey evidence offered by appellants, a survey which failed to establish the likelihood of such confusion and the results of which were rejected by the district court.

We find, after consideration of all pertinent factors under trademark principles and the law of unfair competition, that neither party has demonstrated entitlement to equitable protection of their respective marks and hereby order the dissolution of the injunction entered against appellants herein. In so holding, we do, however, adopt the suggestion made by appellants that inasmuch as Universal's and General's use of the word "Bionic" was clearly accompanied by references to the respective television series, and that all the footwear made by General contained the name of the television series elsewhere on the footwear, that American will be permitted to continue to market its "Bionic Boot" simultaneously with permitting Universal and General to exploit fully Universal's creativity by marketing the "The Six Million Dollar Man" and the "Bionic Woman" "Bionic Sneakers."

Inasmuch as the district court did not address the pendent state claims under section 368-d of the New York General Business Law (N.Y.Gen.Bus.Law § 368-d) and therefore made no findings of fact or conclusions of law with respect thereto, we deem it inappropriate to address those issues on appeal.

Opinion of district court reversed in part; affirmed in part.