William NASSAU a/k/a Sidecar Willy, Plaintiff,

v.

UNIMOTORCYCLISTS SOCIETY OF AMERICA, INC., et al., Defendants.

No. 97–527–CIV–ORL–22A.

United States District Court, M.D. Florida, Orlando Division.

May 25, 1999.

William Nassau, New Smyrna, FL, Pro se.

Neal J. Blaher, Law Office of Neal J. Blaher, Orlando, FL, for Defendants.

Terry Glidden, New Smyrna, FL, Pro se.

Barry Glidden, New Smyrna, FL, Pro se.

David Turner, Port Orange, FL, Pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONWAY, District Judge.

On April 29, 1997, Plaintiff, William Nassau a/k/a Sidecar Willy, commenced an action in this Court for trademark infringement, unfair competition, defamation, right of publicity, and unfair and deceptive trade practices. In his amended complaint, Plaintiff seeks injunctive relief and damages against Unimotorcyclists Society of America, Inc., David Turner, as the director of promotions and individually, Barry Glidden, as treasurer and individually, Terry Glidden, as secretary and individually, and Jeffrey Hawkins, as president and individually.[1] Plaintiff asserts that his mark, American National Unimotorcyclists Society or "A.N.U.S." possesses "immeasurable national and international goodwill, fame, reputation and recognition  . . . ." (Doc. 33, ¶ 16). As a result, Plaintiff argues that Defendants' mark, "Unimotorcyclists Society of America, Inc.," is likely to cause confusion among consumers. *Id.,* ¶¶ 18–19. Moreover, Plaintiff alleges that "Defendants have attempted to harm Plaintiff's organization through slanderous and defamatory statements to the public" and by engaging in unfair competition. *Id.,* ¶¶ 22, 35. This case was tried to the Court sitting as the trier of fact on March 5, 8, and 9, 1999.

## I. Findings of Fact

In 1991, Plaintiff invented the sport of unimotorcycle racing. A unimotorcycle is a vehicle that contains one wheel and a motor. The sport requires competitors to travel 100 feet from a standing stop while balanced precariously on one wheel. To promote this sport, Plaintiff founded the American National Unimotorcyclists Society, also referred to as A.N.U.S. Plaintiff chose the acronym A.N.U.S. as a marketing ploy.

1. In a personal bankruptcy action filed by Jeffery Hawkins, the bankruptcy court entered an order discharging any claim for money damages by Plaintiff in this case. Hawkins remains a defendant in his capacity as an officer of U.S.A. *See* Doc. 114.

Plaintiff formed A.N.U.S. as a not for profit organization whose goal was to maintain accurate records of the fastest times in unimotorcycle racing and to provide a venue for setting those records. A.N.U.S. primarily organizes, sponsors, and promotes the "World Championships of One Wheeled Racing," which occurs on the Friday of Bike Week and the Saturday of Biketoberfest in Daytona Beach, Florida. In addition to hosting events, the organization advertises regularly and sells paraphernalia containing its name. Throughout the years, A.N.U.S. has become well known in Daytona Beach, and has been discussed in various national "biker" magazines and in some international articles.

To regulate its races, A.N.U.S. promulgated rules, known as the "Ten Commandments," for unimotorcycle racing. The Ten Commandments are as follows:

1. THOU SHALL only race from a standing stop to the end of a 100 foot strip which is constructed of an unpaved surface. Winner having the fastest time.

2. THOU SHALL use only one (1) wheel.

3. THOU SHALL only use a power plant that is over five (5) years old.

4. THOU SHALL only use a power plant that is stock for whatever its intended use was.

5. THOU SHALL NOT exceed the size limits of four (4) foot in width or eight (8) foot in length.

6. THOU SHALL compete in any of these classes:
   A) 750 cc—Unlimited
   B) 440 cc—749 cc
   C) 200 cc—399 cc
   D) 0—199 cc
   E) Electric

7. THOU SHALL employ a "Deadman's Switch" which shall render the Beast inoperable in the event that the pilot is launched.

8. THOU SHALL consider steering and brakes optional.

9. THOU SHALL NOT touch the ground forward of the axle during any run.

10. THOU SHALL touch the Ground only rear of the axle during any run but may not exceed size limitations.

(Pl.Exh. 21).

A.N.U.S. began sponsoring events in 1993. In 1995, A.N.U.S. hosted its most successful event in terms of participation and attendance. The competition occurred in a field in Samsula, Volusia County, Florida, but was stopped by the Sheriff's Office due to zoning problems. The next year, to avoid any problems, A.N.U.S. contacted County officials, and they agreed on a location for the event. However, a few days before the competition, the County prevented A.N.U.S. from racing at that location due to traffic, noise and safety concerns.

Because of the recurring problems A.N.U.S. had in finding appropriate locations for races, some of the unimotorcycle pilots, who had been members of A.N.U.S., approached Jeffrey Hawkins in March 1996 and asked him to represent them and find them a legitimate place to race. As a result, Hawkins went to the county fairgrounds and negotiated an agreement. On the day of the race, Plaintiff arrived and ran the event pursuant to his rules.

Even after the event at the fairgrounds, the unimotorcycle pilots were disappointed with the type of racing that A.N.U.S. sponsored. For instance, at A.N.U.S. events, only one vehicle at a time was raced, and a stopwatch was used to record the times. The pilots were also frustrated with A.N.U.S. inability to secure a location for the races. Consequently, Hawkins, along with several pilots, formed the Unimotorcyclists Society of America, Inc. ("U.S.A."). Shortly thereafter, Terry Glidden, Barry Glidden, and David Turner joined U.S.A.

The members of U.S.A. immediately attempted to distance themselves from Plaintiff's organization. They chose a "cleaner" sounding name and wanted to become a family-oriented organization. In

addition, they offered a different type of competition. For example, U.S.A. offered side-by-side racing, it paid its pilots, and it used electronic timing for accuracy. Moreover, the Defendants never used the A.N.U.S. logo, never represented that they were associated or affiliated with A.N.U.S. or American National Unimotorcyclists Society, never sponsored events using the name A.N.U.S. or American National Unimotorcyclists Society, and never sold merchandise containing the name A.N.U.S. or American National Unimotorcyclists Society.

On May 30, 1995, Plaintiff registered his mark with the State of Florida as:

American National Unimotorcyclists Society "A.N.U.S." and Design of a One Wheeled Vehicle Surrounded by One Circle to be used as a mark under class(es) 0041.

(D–USA Exh. 2). He disclaimed the words "American" and "National." *Id.* Subsequently, Plaintiff filed a trademark application with the United States Patent and Trademark Office on August 8, 1996. (D–USA Exh. 30). In response to the application, the Patent and Trademark Office stated, among other things, that "[t]he applicant must disclaim the descriptive wording 'American, National' and 'Unimotorcyclists Society' apart from the mark as shown." *Id.* Plaintiff responded: "I do not disclaim the wording 'Unimotorcyclists Society' as I am the sole member of the American National Unimotorcyclists Society and invented the word 'Unimotorcyclists' for my business." *Id.* Again, the Patent and Trademark Office disagreed, explaining as follows:

[t]he requirement for a disclaimer of 'Unimotorcyclists Society' is continued for the reasons previously set forth, to wit, applicant is a group or society of individuals who ride or are Unimotorcyclists. In addition, to the NEXIS previously made of record the word is merely descriptive because it describes the fact that a unimotorcyclist or unimotorcycle is a motorcycle that contains only one wheel.

*Id.* Due to Plaintiff's federal court litigation, the Patent and Trademark Office suspended his application. *Id.*

Defendants registered their trademark with the State of Florida on September 24, 1996. The registered mark is "Unimotorcyclists Society of America, Inc," and its logo "depicts an eagle with wings spread in flight clutching a wheel in its talons and encased in a circle with Unimotorcyclists Society of America, Inc. printed around the circle." (D–USA Exh. 24). Defendants stated in their application that no claim was made to the exclusive right to use the term "Unimotorcyclists Society of America, Inc." apart from the mark as shown. *Id.* Defendants also use "Unimotorcyclists Society of America, Inc." superimposed on an American flag to identify their organization. .

## II. Conclusions of Law

### A. *Trademark Infringement*

Because Plaintiff's trademark is not currently registered with the United States Patent and Trademark Office, he is not entitled to relief under 15 U.S.C. § 1114.[2]

**2.** That statute provides in relevant part:

    (1) Any person who shall, without the consent of the registrant—

      (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

      (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

Therefore, Plaintiff's only cause of action for federal trademark infringement is pursuant to 15 U.S.C. § 1125. That provision provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

■ To prevail on a claim under this provision, Plaintiff must demonstrate that: (1) he is the prior owner of the mark, and (2) the Defendants' mark is the same or confusingly similar to Plaintiff's, such that there is a likelihood of confusion for consumers as to the proper origin of the goods or services.[3] *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984); *Harley–Davidson Motor Co. v. Iron Eagle of Central Fla., Inc.,* 973 F.Supp. 1421, 1424 (M.D.Fla.1997). The Court must first address, however, whether Plaintiff's mark is distinctive enough to deserve protection under the trademark laws. *Ice Cold Auto Air of Clearwater, Inc. v. Cold Air & Accessories, Inc.,* 828 F.Supp. 925 (M.D.Fla.1993).

**3.** The elements required to prevail on Plaintiff's state statutory and common law claims

■ There are four categories of distinctiveness in classifying a mark: (1) generic; (2) descriptive: (3) suggestive; and (4) arbitrary or fanciful. *Popular Bank of Florida v. Banco Popular de Puerto Rico,* 9 F.Supp.2d 1347, 1356 (S.D.Fla.1998) (citing *Investacorp, Inc. v. Arabian Investment Banking Corp.,* 931 F.2d 1519, 1522–23 (11th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991)). "A generic mark is one which suggests the basic nature of the service." *Id.* The Court will withhold trademark protection for generic terms to avoid the creation of a monopoly in favor of the first provider of goods or services. *Ice Cold Auto Air of Clearwater, Inc.,* 828 F.Supp. at 931. On the other hand, a descriptive mark identifies a characteristic or quality of a product, "such as its intended use, ingredients, dimensions, or desirable features." *Popular Bank of Fla.,* 9 F.Supp.2d at 1356. A descriptive term is not protectable unless it has acquired a secondary meaning. Plaintiff has the burden of sustaining a high decree of proof in establishing a secondary meaning for a descriptive mark. *Investacorp, Inc.,* 931 F.2d at 1525. Absent consumer survey evidence, as is the case here, four factors may be considered in determining whether a particular mark has acquired secondary meaning:

"(1) [T]he length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's ... business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service]."

*Id.* (quoting *Conagra, Inc.,* 743 F.2d at 1513).

Plaintiff argues that he is entitled to protection for the following marks: "A.N.U.S.," "American National Unimotorcyclists Society," "Unimotorcyclists" and "Unimotorcyclists Society." He claims

are similar to those required under 15 U.S.C. § 1125.

that he coined the word "unimotorcycle" in 1991. Defendants do not dispute that Plaintiff's logo in its entirety is entitled to trademark protection. However, they do dispute that Plaintiff is entitled to protection for the word "unimotorcycle" or "unimotorcyclists society." The Court agrees.

The Court initially finds that the word "unimotorcycle" is a generic mark. Unimotorcycle suggests what the vehicle actually is: a one-wheeled vehicle with a motor. Plaintiff argues that the vehicle is a unicycle. However, a "unicycle" is defined as a "trick riding device with only one wheel, which is straddled by the rider, who pushes its pedals." *Webster's New World Dictionary* (2d Edition 1986). A unicycle does not have a motor. Because a unimotorcycle has a motor, that word suggests the basic nature of the vehicle.

In addition, based on the evidence presented at trial, the word "unimotorcycle" was common before Plaintiff began his business. David Lesizza, a defense witness, testified that in 1968 he built a motorized, one-wheeled motorcycle. He stated that at that time, the invention was called a unibike, a unicycle and a unimotorcycle. Hawkins specifically asked him: "Is it fair to say you've heard the word unimotorcycle before today and back in 1968, you heard it?" Lesizza responded: "Oh, yeah, sure." Therefore, because trademark law prevents a person from removing a word from the general language and appropriating it for his own trademark, Plaintiff cannot seek protection for the word "unimotorcycle." *See Harley–Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir.1999).

Even if the word "unimotorcycle" was uncommon when Plaintiff formed his organization, the word can become generic if a substantial majority of the public uses the word "unimotorcycle" to refer to a one-wheeled motorized vehicle. *See Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 101 (2d Cir.1989). Defendants submitted newspaper and magazine articles demonstrating that the public and the media think the word "uni-

motorcycle" connotes the generic name of the product rather than a mark indicating the source of the product. For example, some of the articles state as follows: (1) "14 unimotorcycles carried their pilots the mandatory 100 feet..." (D–USA Exh. 9); (2) "Sidecar Willie, in his infinite madness, created a 1940 Indian Chief unimotorcycle and challenged Harley–Davidson to a unimotorcycle racing dual. Two Harley Sportster unimotorcycles showed up to answer that challenge ..." (D–USA Exh. 12); (3) "This event turned out to be a wild party with unimotorcycles flying down the track .... In fact, many of the pilots of these one-wheeled motorcycles in their enthusiasm ran their "Beasts" (unimotorcycles) in fits of frenzy ..." (D–USA Exh. 14); (4) "The Indian and Harley unimotorcycles will be unveiled to the public;" (D–USA Exh. 18) (5) "For the uninitiated, a unimotorcycle is a contraption with regular motorcycle running gear fitted atop a single wheel" (D–Ind Exh. 2); (6) "A unimotorcycle looks like a super-powered engine with handlebars and a wheel mounted to it, along with a place for a rider to sit" (D–Ind Exh. 13); and (7) "Unimotorcycles can reach speeds upwards of 70 mph on the short drag strip" (Pl.Exh. 11). This evidence is a strong indication of the general public's perception that a unimotorcycle connotes something other than a machine built or used by Plaintiff or a service offered by Plaintiff.

In addition, Plaintiff himself used the word "unimotorcycle" in referring to the vehicle rather than specifically to his organization or races. Although Plaintiff referred to his events as "unicycle drag racing" in the beginning, in 1995 and 1996, Plaintiff referred to the events as "unimotorcycle drag racing." (D–USA, Exh. 6). Moreover, in his questioning of the witnesses at trial, he referred to the word "unimotorcycle" in its generic sense. For example, he asked Donna Knuth, the secretary of A.N.U.S.: "Who currently runs unimotorcycle races at the Volusia County Fairground?" She responded: "Unimotorcyclists Society of America." He also

asked Hawkins how many "unimotorcycle events" U.S.A. had sponsored over the years. Plaintiff further inquired: "[i]sn't it true that the community that frequent unimotorcycle racing, the competitors, is a very small community and therefore pretty much known to each other?"

Because evidence in the record exists that the word "unimotorcycle" was used as early as 1968 and because the word is commonly used to refer to the vehicle rather than to Plaintiff's product or service, the word "unimotorcycle" is a generic term for a one-wheeled motorized vehicle. Thus, the word is unable to be protected under trademark laws.

■ Plaintiff also claims that he has rights in the term "Unimotorcyclists Society" by itself. This is a descriptive mark because it describes the characteristics and nature of Plaintiff's business. Thus, Plaintiff must establish that the mark has acquired secondary meaning. At trial, Plaintiff and Knuth testified that Plaintiff's business is commonly known as the "Unimotorcyclists Society." However, Plaintiff has never used "Unimotorcyclists Society" as his mark. On all of his advertisements, products, and sponsorships, Plaintiff referred only to "American National Unimotorcyclists Society," "A.N.U.S.," or the entire logo. One of Plaintiff's witnesses, Hilly Rowley, testified that he did not recall whether Plaintiff's organization was referred to as "Unimotorcyclists Society," and Plaintiff did not present any credible evidence demonstrating that the public actually identifies the name "Unimotorcyclists Society" with Plaintiff's business. Therefore, the Court concludes that Plaintiff failed to meet his burden of demonstrating that "Unimotorcyclists Society" has acquired secondary meaning.

In any event, the Eleventh Circuit has held that the validity of a mark is determined by viewing the trademark as a whole and not just by viewing the individual words. *Lone Star Steakhouse & Saloon, Inc. v. Lone Star Steakhouse & Saloon of Georgia, Inc.*, 106 F.3d 355, 362 (11th Cir.), *modified on reh'g*, 122 F.3d 1379 (11th Cir.1997). Plaintiff claims that "American National Unimotorcyclists Society," "A.N.U.S.," and his entire logo are entitled to trademark protection. The name of Plaintiff's business is merely descriptive because it describes the nature, characteristics, and qualities of his organization. Therefore, Plaintiff must establish that his marks have acquired secondary meaning. Through the testimony and exhibits submitted at trial, Plaintiff has met his burden of demonstrating that his marks have acquired secondary meaning. As a result, Plaintiff is entitled to some protection in his marks.

Because no dispute exists regarding Plaintiff's prior rights to his mark, the Court will analyze whether Defendants' mark is confusingly similar. Likelihood of confusion is determined by an analysis of the following:

(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, i.e. retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion.

*Conagra, Inc.*, 743 F.2d at 1514. Of these factors, the type of mark and the evidence of actual confusion are the most important. *Lone Star Steakhouse & Saloon*, 122 F.3d at 1382.

*Type of Mark.* In analyzing the type of mark, a court must determine whether the mark is strong or weak in order to determine the level of protection to be extended to the mark. The Eleventh Circuit has explained:

The more distinctive a plaintiff's servicemark, the greater the likelihood that consumers will associate the registered trademark and all similar marks with

the registered owner. The law therefore provides the greatest protection to strong and distinctive servicemarks; the strength of a mark depends on the extent of third party usage and the relationship between the name and the service or good it describes. *Freedom Savings and Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). "Extensive use by third parties suggests that there would be no likelihood of confusion between the plaintiff and the alleged infringer." *Ice Cold Auto Air of Clearwater, Inc.,* 828 F.Supp. at 935.

As set forth above, the mark "American National Unimotorcyclists Society" is a weak mark because it is merely descriptive. In addition, each of its words are used extensively by third parties. Consequently, because the mark is weak, it is entitled to a lower amount of protection.

■ *Similarity of the Marks.* In determining whether the parties' marks are similar, the Court should consider the overall impression created by the marks rather than comparing individual features of the marks. *Ice Cold Auto Air of Clearwater, Inc.,* 828 F.Supp. at 936 (citing *BellSouth Advertising & Publishing Corp. v. Real Color Pages,* 792 F.Supp. 775, 781 (M.D.Fla.1991)). "The analysis should include a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *Id.*

Plaintiff's logo depicts a one-wheeled vehicle surrounded by one circle. On the circle, "American National Unimotorcyclists Society" is printed. On the inside of the circle, "A.N.U.S. Samsula–Fla" is printed. Defendants' mark depicts an eagle with its wings spread in flight clutching a wheel in its claws, which is surrounded by a circle. "Unimotorcyclists Society of America, Inc." is printed on the inner side of the circle. U.S.A.'s mark is also shown with "Unimotorcyclists Society of America, Inc." superimposed on an American flag.

The appearance and manner in which the logos are displayed are dissimilar.

The names of the two organizations are different as well. A.N.U.S. is dissimilar from U.S.A., and "American National Unimotorcyclists Society" is dissimilar from "Unimotorcyclists Society of America, Inc." The meanings of the marks are also different. When Defendants formed their organization, they wanted to have a "cleaner" image than "A.N.U.S." so that everyone could be involved, including children. A.N.U.S., on the other hand, appeals to a certain crowd, and its name is controversial. Therefore, because the marks are dissimilar, this factor weighs against a finding of likelihood of confusion.

*Similarity of Goods and Services.* Defendants do not dispute that their goods and services are similar.

*Similarity in Sales Methods.* Defendants do not dispute that their sales methods are similar.

*Similarity in Advertising Methods.* Defendants do not dispute that their advertising methods are similar.

*Defendants' Intent.* The Court does not find that Defendants hoped to gain a competitive advantage by associating their goods and services with Plaintiff's established mark. The evidence at trial revealed that U.S.A. was formed in response to Plaintiff's failure to provide reliable racing locations. After forming their own organization, Defendants attempted to distance themselves from Plaintiff's organization. They chose a completely different mark and a different type of racing. In addition, they had a different attitude toward their organization in that they wanted it to be family-oriented. Finally, there was no evidence presented at trial that Defendants used Plaintiff's mark to identify themselves.

*Actual Confusion.* Plaintiff can establish actual confusion by presenting evidence of individuals who have actually become confused about the source of the services and products because of the simi-

larities between the parties' trademarks. *Popular Bank of Fla.,* 9 F.Supp.2d at 1360. "Such instances of confusion include consumer inquiries regarding possible affiliation between the parties or attempts to purchase goods or services actually offered by the other party." *Id.* Although no absolute measure exists as to how many instances are sufficient to establish likelihood of confusion, the court must evaluate the evidence in light of the totality of the circumstances. *Id.* (citing *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1543 (11th Cir. 1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987)).

At trial, Plaintiff called Hilly Rowley, one of the persons responsible for the rental of the municipal stadium in Daytona Beach, who testified that some confusion existed when both groups attempted to rent the stadium for the same day. On direct, Rowley testified as follows:

> There was another group that came to us .... And there was some confusion as to being in such a unique event, unimotorcyclists, we assumed, which was wrong on our part, ... that everybody was on the, in the same page, so to speak, with the same parties.

On cross-examination, Rowley explained why there was some initial confusion:

> I stated earlier that we had two groups come to us and basically around the same time period. Both representing the unimotorcyclists groups. Like I stated, this is the first time we ever had a unimotorcyclists group approach us. When I say us, there was another party involved with, Helen Regor, who was [the] Special Events Coordinator. I think Mr. Hawkins' group approached Miss Regor first.... So when, when we discovered that there were actually two different groups wanting to lease the stadium, then we realized we had a problem as to which group approached us first and that would be the way that we would determine as to which group would be able to lease the stadium.

Rowley's testimony indicates that the confusion stemmed from a miscommunication between himself and Regor, rather than actual confusion between the different groups' names.

Knuth also testified that there was some confusion from advertisers, newspapers, and A.N.U.S.' own members. The Court finds that Knuth's testimony is to be given little weight. Plaintiff could have presented this evidence in a more complete manner by submitting evidence of actual confusion directly through the in-court testimony of at least several confused advertisers, members, or spectators. Defendants could have then cross-examined these witnesses about the nature of their confusion. Instead, Plaintiff presented his evidence of actual confusion through Knuth, who merely gave some vague examples of confusion. Without specific evidence of consumer confusion, Plaintiff has failed to meet his burden of demonstrating that the confusion constituted more than isolated events or a simple misunderstanding.

■ After balancing the seven factors, the Court finds that Plaintiff has not met his burden of establishing a likelihood of confusion. The similarity of the products and service, the similarity of advertising methods, and the similarity of sales methods weigh in favor of a finding of likelihood of confusion. However, due to the weakness of Plaintiff's mark, the lack of Defendants' intent to gain a competitive advantage by associating their product with the Plaintiff's established mark, the dissimilarity of the two marks, and the lack of actual evidence of confusion, the Court concludes that there is not a likelihood that consumers will be confused about the relationship or affiliation between Plaintiff's products or services and the Defendants' product and services. Therefore, Plaintiff's claim of trademark infringement fails.

*B. Unfair Competition*

Because Plaintiff's claim of trademark infringement fails, his claim of unfair competition based on his trademark infringement claim fails as well. *See Tally–Ho,*

*Inc. v. Coast Community College District,* 889 F.2d 1018 (11th Cir.1989) (explaining that likelihood of confusion is an element of common law unfair competition); *The American Bank of Merritt Island v. First American Bank and Trust,* 455 So.2d 443 (Fla. 5th DCA 1984)(finding that the plaintiff must establish that customer confusion is probable to prevail on a claim of unfair competition).

Unfair competition also " 'encompass[es] a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another.' " *Murphy Door Bed Co., Inc.,* 874 F.2d at 102 (quoting *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 662 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)). Such practices include " 'confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.' " *Id.*

■ Plaintiff asserts that Defendants attempted to copy his advertisements and his Ten Commandments. However, as previously discussed, the evidence demonstrates that Defendants distanced themselves from Plaintiff's organization. They offered a different type of racing and a different type of organization. U.S.A.'s advertisements clearly identify U.S.A. as the sponsor and are different from Plaintiff's advertisements. In addition, although some of the rules of racing are similar, Defendants did not copy Plaintiff's "Ten Commandments." Therefore, Plaintiff is unable to establish by a preponderance of the evidence that Defendants misappropriated his labor, skill, or expenditures.

### C. Right of Publicity

■ Plaintiff alleges that Defendants "have misappropriated for their own benefit the right of publicity of Plaintiff." (Doc. 33, ¶ 36). Although Plaintiff does not specify the common law or statutory basis for this claim, to the extent Plaintiff seeks relief pursuant to Fla. Stat. § 540.08, the Court finds Plaintiff's claims to be without merit. That statute provides, in relevant part:

> (1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use . . . .

Fla. Stat. § 540.08(1). There is no evidence in the record that Defendants published Plaintiff's name without his consent.

### D. Defamation

■ To state a cause of action for defamation in Florida, the plaintiff must establish that: (1) the defendant published a false statement; (2) the false statement was about the Plaintiff; (3) the false statement was published to a third party; and (4) the falsity of the statement caused injury to the plaintiff. *Valencia v. Citibank International,* 728 So.2d 330 (Fla. 3d DCA 1999) (citing *Seropian v. Forman,* 652 So.2d 490 (Fla. 4th DCA 1995)). Plaintiff asserts that Defendants "put out defamatory letters telling bikers 'you got to fight for the right to race.' " In addition, Knuth testified that Defendants initiated a campaign against Plaintiff to turn the public and the pilots against him.

■ The statement "Help Bikers Fight for the Right to Race" was printed on flyers that advertised fundraisers to raise money for Defendants' legal fees. (Pl. Exh. 26). Plaintiff did not show how this statement was defamatory. In addition, Knuth did not specify in her testimony any statements that were defamatory. Furthermore, Plaintiff has failed to direct the Court's attention to any false statements made by the Defendants. Therefore, Plaintiff cannot prevail on this claim.

### E. Florida Deceptive and Unfair Trade Practices Act

■ The Florida Deceptive and Unfair Trade Practices Act provides in relevant part:

Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

§ 501.204(1), Fla. Stat.

This act only provides remedies for consumer transactions and has no application to a cause of action for damages based on trademark infringement. *Babbit Electronics, Inc. v. Dynascan Corp.,* 828 F.Supp. 944, 958 n. 7 (S.D.Fla.1993), *aff'd,* 38 F.3d 1161 (11th Cir.1994). However, a cause of action exists under that act for injunctive relief. *See* § 501.211(1), Fla. Stat. Nevertheless, as previously discussed, Plaintiff has not met his burden of establishing unfair or deceptive trade practices. Plaintiff is unable to demonstrate that Defendants passed off their services or goods as Plaintiff's or otherwise benefitted from Plaintiff's mark. Therefore, Plaintiff cannot prevail on this claim.

## III. Conclusion

Based on the foregoing, it is ORDERED as follows:

1. The Clerk shall enter final judgment in favor of Defendants providing that Plaintiff, William Nassau a/k/a Sidecar Willy, shall recover nothing on his claims and that Defendants Unimotorcyclists Society of America, Inc., Jeffrey Hawkins, Terry Glidden, Barry Glidden, and David Turner, shall recover their costs of action.

2. The Clerk is directed to close this case.